J-S01035-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.J.H. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1174 WDA 2022 |

Appeal from the Order Entered September 14, 2022
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  No. 2021-1175 IVT

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.C.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: A.M.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1175 WDA 2022 |

Appeal from the Order Entered September 14, 2022
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2021-1174 IVT

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.O.H., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1176 WDA 2022 |

Appeal from the Order Entered September 14, 2022
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s):  2021-1176 IVT

J-S01035-23

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:                    **FILED: FEBRUARY 7, 2023**

A.M.H. ("Mother") appeals from the orders entered September 14, 2022, in the Court of Common Pleas of Cambria County, involuntarily terminating her parental rights to her sons: D.O.H., Jr., born in July 2013; A.C.H., born in April 2015; and C.J.H., born in April 2016 (collectively, "the Children").[1]  Upon careful review, we affirm.

The record reveals that Cambria County Children and Youth Services ("CYS" or "the Agency") first initiated in-home services for this family in May 2020, due to the poor condition of Mother's home.  CYS Exhibit 6, Child Permanency Plan, 9/23/20.  By August 2020, CYS had continuing concerns about the deplorable state of Mother's home, as well as Mother's mental health and parenting ability.  *Id.*  Pursuant to a safety plan implemented in August 2020, Children began residing with maternal grandparents.  *Id.*; N.T., 6/24/22, at 6.  Nonetheless, due to the maternal grandparents being unable to continue as a resource for the Children, the juvenile court placed the Children in the physical custody of CYS on or around September 16, 2020.  N.T., 6/24/22, at 6.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] On January 19, 2022, the orphans' court entered decrees involuntarily terminating the parental rights of the Children's father, D.O.H., Sr. ("Father"). Father did not file separate appeals, and he is not a participating party to the instant appeal.

- 2 -

Following a hearing, the juvenile court adjudicated the Children dependent on September 25, 2020, and the permanency goal for the Children was reunification.[2] The court held permanency review hearings for the Children at regular intervals.

Mother's objectives in furtherance of the permanency goal included, *inter alia*, (1) attending supervised visits with the Children; (2) completing a psychological evaluation; (3) keeping all appointments with her mental health professionals; (4) keeping all appointments and working with the social worker, regarding parenting and mental health; (5) keeping her appointments with the Independent Family Services ("IFS") home management program; (6) maintaining a clean and safe home; (7) submitting random drugs screens and, if a screen returned positive, completing a drug and alcohol assessment; and (8) allowing a CYS worker to inspect and photograph her home. N.T., 6/24/22, at 20-21.

CYS referred Mother to Dennis M. Kashurba for a court-ordered psychological evaluation. CYS Exhibit 11. Mother's evaluation was initially scheduled for August 27, 2020, but Mother failed to attend. N.T., 9/8/22, at 18. Her evaluation was rescheduled for December 4, 2020. *Id.* at 20. While Mother appeared, she was "not willing to be engaged in formal assessment

---

[2] During the subject proceeding, CYS introduced the Children's dependency record as CYS Exhibit 7, which the orphans' court admitted into evidence.

- 3 -

procedures" and participated in only the clinical interview. *Id.* at 20; CYS Exhibit 11. A third evaluation was scheduled for April 29, 2021. *Id.* at 24. Mother presented for the assessment, but she informed Mr. Kashurba that she needed to leave early that day. *Id.* at 24-25.

On October 1, 2021, CYS filed petitions to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), at which time the Children were eight, six, and five years old, respectively. The orphans' court appointed Suzann Lehmier, Esquire, as counsel to represent the Children in accordance with 23 Pa.C.S. § 2313(a).[3]

An evidentiary hearing on the petitions to terminate Mother's parental rights was held on June 24, 2022, and September 8, 2022. CYS presented the testimony of: CYS caseworker, Barb Lusczek; the Bair Foundation family advocate, Julia Bloom; psychologist, Mr. Kashurba; and IFS in-home worker, Kathy Scaife. Mr. Kashurba was stipulated as an expert in psychology. Mother testified on her own behalf, and she presented the testimony of: Alternative Community Resource Program ("ACRP") blended case management supervisor, Lisa Weigel; and the Children's maternal grandmother, S.T.

---

[3] By order entered January 19, 2022, the court found that no conflict existed between the Children's legal and best interests. *See In re K.M.G.*, 240 A.3d 1218, 1235 (Pa. 2020) ("[W]here an orphans' court has appointed a [guardian *ad litem*]/Counsel to represent both the child's best interests and legal interests, appellate courts should review *sua sponte* whether the orphans' court made a determination that those interests did not conflict.").

The CYS caseworker, Ms. Lusczek, testified that she began working with the family in September 2020, and she noted that Mother made false statements on numerous occasions. N.T., 6/24/22, at 11, 30. Ms. Lusczek testified that when CYS first became involved, Mother claimed she was pregnant with twins. *Id.* at 30. Ms. Lusczek noted that Mother underwent an ultrasound in October 2020, which revealed she was not pregnant. *Id.* 30-31. Ms. Lusczek noted that, despite the ultrasound result, Mother continued to insist that she was pregnant. *Id.* at 31. Ms. Lusczek testified that Mother alleged that one of the Children presented at a visit with stitches, but Ms. Lusczek verified that none of the Children had stitches. *Id.* at 32. Ms. Lusczek also testified that Mother reported the Children had called her crying and saying they wanted to go home and that Mother called the police because she was upset. *Id.* Ms. Lusczek explained that she followed up with CYS and law enforcement, and she learned that nobody was contacted by Mother. *Id.*

Mr. Kashurba testified that, upon reviewing Mother's records, her primary diagnosis was borderline personality disorder, and the "classic presentations" of this disorder include "emotional dysregulation and behavioral discontrol [sic]." N.T., 9/8/22, at 21-22. Mr. Kashurba testified that "[c]omplaints of a hypochondrial nature appear to have blossomed," noting that Mother had reported to her caseworker that she was pregnant, but "[i]t was verified that [Mother] had never been pregnant." *Id.* at 23.

Mother testified that she is currently attending domestic violence counseling once a month through the Domestic Violence Center. *Id.* at 55-56, 93. She testified that she had been on a waitlist for therapy for over ten months, and she just began seeing a therapist at Behavioral Health in August.[4] *Id.* at 56, 93. Mother testified that she began attending parenting classes at Justice Works in November and completed the program in February or March.[5] *Id.* at 56-57.

Following the hearing, the orphans' court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b) by orders dated and entered September 14, 2022. Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court issued a Rule 1925(b) statement, wherein it relies on its order and opinion dated September 14, 2022.

On appeal, Mother raises the following issue for review:

Whether the [orphans'] [c]ourt committed reversible error in finding that [CYS] met its burden by clear and convincing evidence that the parental rights of Mother should be terminated with respect to the minor [C]hildren[?]

Mother's Brief at 4.

---

[4] As best we can discern, Mother began her therapy sessions at Behavioral Health in August 2022. *See* N.T., 9/8/22, at 56, 93.

[5] Mother began the Justice Works parenting class in November 2021 and completed the program in February or March 2022. *Id.* at 56-57.

"In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358.

Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.*; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

In this case, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows.

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

To prove Section 2511(a)(1), "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." ***In re Adoption of B.G.S.***, 245 A.3d 700, 706-07 (Pa. Super. 2021) (citation omitted).  As our Supreme Court recently explained,

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a child, such as love, protection, guidance and support.  Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship.  The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life.

***L.A.K.***, 265 A.3d at 592 (citations and quotation marks omitted).

Trial courts should consider the entire history of the case and avoid applying the statutory six-month requirement mechanically. *C.M.*, 255 A.3d at 364. However, the General Assembly's emphasis on the six months immediately preceding the filing of the termination petition indicates this timeframe is the "most critical period for evaluation" of a parent's conduct. *L.A.K.*, 265 A.3d at 592.

"[T]he question of whether a parent has failed or refused to perform parental duties must be analyzed in relation to the particular circumstances of the case." *In re Burns*, 379 A.2d 535, 540 (Pa. 1977). To this end, if competent evidence establishes the statutory criteria under Section 2511(a)(1), then trial courts must proceed to evaluate the totality of the circumstances "under three lines of inquiry: (1) the parent's explanation for his or her absence; (2) the post-abandonment contact between parent and child, including a parent's efforts to re-establish contact; and (3) consideration of the effect of termination of parental rights on the child pursuant to Subsection 2511(b)." *C.M.*, 255 A.3d at 365. In evaluating the parent's explanation, the court should bear in mind that "[p]arental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs." *Id.* at 364 (citations and quotation marks omitted).

With respect to Section 2511(b), the court "shall give primary consideration to the developmental, physical and emotional needs and welfare

of the child." 23 Pa.C.S. § 2511(b). The "emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." *T.S.M.*, 71 A.3d at 267 (citation and quotation marks omitted). Our Supreme Court has made clear that Section 2511(b) requires the trial court to consider the nature and status of the bond between a parent and child. *In re E.M.*, 620 A.2d 481, 484-85 (Pa. 1993). Existence of a bond does not necessarily result in denial of a termination petition. *T.S.M.*, 71 A.3d at 267. Instead, the court must examine the effect on the child of severing such bond. *Id.* "When examining the effect upon a child of severing a bond, courts must examine whether termination of parental rights will destroy a 'necessary and beneficial relationship,' thereby causing a child to suffer 'extreme emotional consequences.'" *In re J.N.M.*, 177 A.3d 937, 944 (Pa. Super. 2018) (quoting *E.M.*, 620 A.2d at 484-485).

"While a parent's emotional bond with his or her child is a major aspect of the [s]ubsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re M.M.*, 106 A.3d 114, 118 (Pa. Super. 2014). "In addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id.*

Instantly, Mother argues that the orphans' court erred or abused its discretion in terminating her parental rights pursuant to Section 2511(a)(1) because "while the evidence presented may have **mechanically** supported the termination, an examination of the whole[] does not."  Mother's Brief at 11 (emphasis in original).  Specifically, she claims the court did not adequately consider the impact of the pandemic, as she had difficulty finding a therapist due to insurance issues and waiting lists, and she was only able to reengage in therapy in 2022.  *Id.* at 10.  Mother alleges that in 2022, she was employed, rectified her housing issues, and completed a parenting class.  *Id.* at 9-10.  Mother's argument fails.

The record supports the orphans' court's termination of Mother's parental rights under Section 2511(a)(1).  The Children have been in foster care since September 2020.  N.T., 6/24/22, at 34, 59.  CYS filed petitions to terminate Mother's parental rights in October 2021, and Mother was served with the petitions on December 15, 2021.  CYS Exhibit 1.  In turn, the critical six-month period relevant to the Section 2511(a)(1) analysis is from June 2021 to December 2021.  *See L.A.K.*, 265 A.3d at 591.

Though Mother asserts that the pandemic limited her ability to cooperate with CYS or comply with the permanency plan, her assertion is belied by the record.  *See* Mother's Brief at 9-10.  The record shows that in order to reunify with the Children, Mother had to address a number of objectives, including but not limited to: completing a psychological evaluation;

keeping all appointments with the social worker, the mental health providers, and the IFS home management worker; maintaining a clean and safe home; allowing CYS to inspect and photograph her home; complying with random drug screens; and attending supervised visits. N.T., 6/24/22, at 20-21.

At the outset, Mother expressly acknowledges her lack of compliance: "Admittedly, Mother failed to comply with the permanency plan, and failed to cooperate sufficiently to satisfy the [A]gency's demands." Mother's Brief at 9. Mother similarly testified about her failure to cooperate with services. On cross-examination, Mother testified:

> Q. Do you think looking back over, you know, the case since this started in 2020, do you think that you were cooperative with CYS?
>
> A. No. I was not. I take full responsibility for not being cooperative, but in my defense[,] I didn't trust really anybody. I mean the one person who I was supposed to trust, he violated so badly that I don't know who to trust.

N.T., 9/8/22, at 88. CYS caseworker Ms. Lusczek also testified that Mother was "fairly uncooperative throughout." N.T., 6/24/22, at 20, 57.

The record shows that the appropriate services and programs were available to Mother since the Children entered CYS custody in September 2020, but Mother failed to comply with the services. With respect to Mother's mental health, Mr. Kashurba, who conducted the psychological evaluation, testified that he attempted to evaluate Mother on three separate occasions, none of which were fully successful. N.T., 9/8/22, at 18-20, 24-25. Mother failed to attend the evaluation on August 27, 2020. *Id.* at 19. On December

4, 2020, Mother appeared for the evaluation, but "she was not willing to be engaged in formal assessment procedures." *Id.* at 20. Mr. Kashurba testified that he only spoke with Mother "in regard to her circumstances as she felt comfortable." *Id.* He testified that there appeared to be ongoing concerns with her parenting ability, safety issues, and home management, and Mother "continues to be in need of enhanced mental health services." *Id.* at 21. Mr. Kashurba's recommendations for Mother at the time included, *inter alia*, resumption and continuation of mental health services at ACRP; referral for home management services to address domestic and financial issues; trauma relationship counseling due to the history of domestic violence; and ongoing CYS caseworker services. *Id.* at 23-24.

Mr. Kashurba testified that during his third attempt at an assessment on April 29, 2021, he was unable to perform a full evaluation because Mother informed him that she needed to leave early that day. *Id.* at 24-25. He testified that Mother did complete shorter tasks, and he consulted with the CYS caseworker, who noted Mother's overall lack of progress suggesting that reunification in the near future would not be an appropriate objective. *Id.* at 25-26. Mr. Kashurba concluded that Mother was given the appropriate services necessary to give her the opportunity to demonstrate her capacity for reunification with her Children. *Id.* at 27. He testified that "there appears to be ongoing concern regarding her ability to be compliant with treatment recommendations that would facilitate successful, sustained reunification with

the [C]hildren." *Id.* When asked whether it was common for an individual scheduled for an evaluation to not show up for the first assessment, not be amenable for completing the second, and then leave early for the third, Mr. Kashurba testified that "[it is] not normal." *Id.* at 28-29. Mr. Kashurba further explained, "She's so self-centered that the interests of the [C]hildren are clearly less of a priority than her agenda item of the moment." *Id.* at 29.

Additionally, CYS caseworker, Ms. Lusczek, testified that Mother had been receiving counseling through ACRP, but she was discharged from ACRP's counseling program on July 28, 2021, due to her noncompliance with their attendance policy. N.T., 6/24/22, at 19, 28. On cross-examination, Mother testified that she was discharged from therapy at ACRP due to her failure to attend. N.T., 9/8/22, at 72. Mother provided the following explanation:

> Q. You were discharged because you weren't going, correct?
>
> A. I was. They were only doing virtual visits, and when she would call[,] it would show up as unavailable or restricted, and I don't answer those calls.

*Id.* Mother testified that she later was on a waitlist for therapy for over ten months and was recently connected with a therapist at Behavioral Health in August 2022. *Id.* at 56, 93.

With respect to the court-ordered random drug screens, Ms. Lusczek testified that Mother refused the screen on March 5, 2021, when Mother claimed that she was prescribed "THC gummies." N.T., 6/24/22, at 22. Ms. Lusczek noted Mother refused a second screen on July 22, 2021, because she

claimed that "her doctor gave her three Percocet to take home." *Id.* Ms. Lusczek testified that Mother refused a third screen on August 5, 2021, when Mother stated that "the doctor put her on pain medication." *Id.* Mother agreed to submit one drug screen on August 12, 2021, because "she stated that she would be clean." *Id.* That screen result was negative. *Id.*

Moreover, Ms. Lusczek noted that Mother did not follow through with CYS social worker, Ashley Shaffer, who provided parenting sessions. N.T., 6/24/22, at 23-25; CYS Exhibit 8, Court Summary, 8/18/21. Ms. Shaffer scheduled thirteen parenting sessions with Mother, but Mother attended eight, failed to attend four, and canceled one. N.T., 6/24/22, at 25. Ms. Lusczek testified that Mother "refused to meet with the social worker after April of 2021." *Id.* Subsequently, Ms. Shaffer provided Mother with additional "hands-on parenting sessions" during four of Mother's visits with the Children at the Bair Foundation Path House. *Id.*; CYS Exhibit 8, Court Summary, 8/18/21. Ms. Lusczek testified that Mother did not demonstrate good or sufficient parenting skills. N.T., 6/24/22, at 25. Mother, ultimately, did not complete a full session of the parenting program provided by the CYS social worker due to Mother's refusal to participate and cooperate. CYS Exhibit 8, Court Summary, 8/18/21.

With respect to her housing condition, the record fails to show consistent or sustained improvement in the condition of Mother's home from 2020 through 2021. At the hearing, Ms. Lusczek described the condition of Mother's

home as depicted in the photographs taken between October 2021 and January 2022. N.T., 6/24/22, at 15-16. Ms. Lusczek testified that in October 2021, while she could not get into Mother's home, she observed pans, leftover shrimp, a box of debris, and garbage laid out on the porch and porch steps of Mother's home. *Id.* at 15. Ms. Lusczek testified that much of the same garbage remained on the porch of Mother's home in November 2021, and she saw the same garbage and debris on the porch in December 2021 and January 2022. *Id.* at 16. Ms. Lusczek testified that there "was an awful smell" emanating from Mother's home as well. *Id.* Ms. Lusczek testified that on August 6, 2022, she returned to Mother's home and observed maternal grandfather cleaning the garbage on the porch. *Id.*

Notably, Mother was offered IFS Home Management services to alleviate the deplorable condition of her home. N.T., 6/24/22, at 18, 21. Kathy Scaife, an IFS in-home worker, testified that she worked with Mother from July 2020 to August 2021. N.T., 9/8/22, at 36. She testified that IFS scheduled fifty-four appointments, Mother kept thirty-nine of them, and fifteen were canceled due to either Mother or the IFS worker. *Id.* at 39. Ms. Scaife testified that, even though Mother was provided with extensive in-home services, she was incapable of learning from those services, and there was no consistency over the course of at least a year. *Id.* at 41. Ms. Scaife testified that she was unable to recommend that the Children return home to Mother because "she remains ignorant of her own actions that led to the removal of her [C]hildren

and made little effort to address and resolve those issues to facilitate the possible return home of her [C]hildren." ***Id.***

Mother asserts that she was able to change her compliance level in 2022, as she is currently employed, rectified the issues within the home, completed a parenting class, and restarted therapy in 2022. Mother's Brief at 10. However, when evaluating a parent's conduct for purposes of Section 2511(a)(1), "the most critical period for evaluation is the six months immediately preceding the filing of the termination period." ***L.A.K.***, 265 A.3d at 591; ***see also*** 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition."). Moreover, "a parent must act with 'reasonable firmness' to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental duties." ***L.A.K.***, 265 A.3d at 591.

Based on the foregoing, we discern no error or abuse of discretion in the orphans' court's decision to terminate Mother's parental rights pursuant to Section 2511(a)(1). Mother refused to comply with the psychological evaluation on multiple occasions, refused to submit multiple drugs screens, refused or failed to cooperate with the CYS social worker after April 2021, and failed to continue with her mental health services due to nonattendance. By

Mother's own admission, she "failed to comply with the permanency plan, and [she] failed to cooperate sufficiently. . ."  Mother's Brief at 9.  The record amply demonstrates that services and programs were available to Mother since the time the Children entered CYS custody, but Mother refused or failed to perform her parental duties of engaging in the appropriate services to reunify with the Children.

Proceeding to Section 2511(b), Mother waived any claim that the orphans' court erred by concluding that termination served the Children's needs and welfare because Mother fails to develop this claim.  *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority.").  Mother makes no reference to the Children's needs or welfare, and she fails to cite to relevant statutory and case authority in the argument section of her brief.  *See* Mother's Brief at 7-11.

Even if Mother preserved a claim with respect to Section 2511(b), we would conclude that the record supports the orphans' court's determination that termination of Mother's parental rights would best serve the Children's developmental, physical, and emotional needs and welfare.  Family advocate, Ms. Bloom, testified that Mother attended approximately forty out of forty-four scheduled supervised visits, which Ms. Bloom had supervised.  N.T., 9/8/22, at 5-6, 11.  Ms. Bloom testified that Mother struggled with managing

the Children's behaviors, noting that D.O.H., Jr., had "meltdowns," and the Children frequently "absconded" from the visitation room. *Id.* at 7-9. Ms. Bloom testified that Mother did not supervise the Children appropriately, and she believed that the Children would not be safe with Mother in an unsupervised environment. *Id.* at 9-10.

Ms. Bloom further noted that over the course of forty visits, Mother did not demonstrate any interest in what the Children wanted or needed. *Id.* at 13. Ms. Bloom noted that Mother did not talk about anything that the Children were interested in, and Mother "had nothing but bad things to say" about the Children's foster home, which "really impacted" the Children because "[t]hey wanted [Mother] to get along with the foster home." *Id.* at 7. Ms. Bloom testified Mother constantly sought validation from the Children, which impacted the Children greatly to the point that "they no longer wanted to attend visits." *Id.* Ms. Bloom testified she spoke with D.O.H., Jr., and A.C.H., and both told her they no longer wanted visits with Mother.[6] *Id.* at 7. Ms. Bloom testified that no bond existed between Mother and the Children, and she believed it was in the Children's best interest to terminate Mother's parental rights. *Id.* at 11-12.

---

[6] Following a permanency hearing on February 16, 2022, the juvenile court suspended Mother's visitation with the Children by orders dated March 1, 2022. This was more than two months prior to the subject proceeding.

Ms. Lusczek also testified that there currently is no bond between the Children and Mother, noting that the "two older boys requested not to visit or even to go home with her." N.T., 6/24/22, at 36. Ms. Lusczek testified that initially, there "probably" was a bond between Mother and the Children. *Id.* However, Ms. Lusczek noted that Mother "drove the wedge through that bond by not embracing the [C]hildren's interests and growth" and Mother has not placed the Children's needs, wants, and desires before her own. *Id.* at 36, 40. Ms. Lusczek testified that the visits with Mother were having a detrimental effect on the Children. *Id.* at 60. Ms. Lusczek testified that terminating Mother's parental rights would be in the Children's best interest because Mother has not taken the necessary steps to address her mental health and to maintain a stable and clean home consistently on her own. *Id.* at 40. Ms. Lusczek testified that the Children will not be negatively impacted if Mother's parental rights are terminated. *Id.* at 42.

Moreover, Ms. Lusczek testified that the Children have been with the same foster parents since September 2020, and "each have a strong and unique bond" with their foster parents. *Id.* at 34, 41, 59. Ms. Lusczek stated that the Children refer to the foster parents as "[m]om and dad," and the foster parents are an adoptive resource for the Children. *Id.* at 59-60. Similarly, Ms. Bloom testified that the Children were bonded to the foster parents, and that they were very happy in the foster home. N.T., 9/8/22, at 11.

Ms. Lusczek noted that each child has his own individual needs, wants, and interests, and both foster parents have taken the time with each child to help them "grow and live out those interests and really make them a priority." N.T., 6/24/22, at 41. Ms. Lusczek testified that all of D.O.H., Jr.'s, needs are being addressed by the foster parents. *Id.* at 35-36. She testified that D.O.H., Jr., has displayed "negative behaviors" and continues to receive counseling. *Id.* at 35. She noted that when D.O.H., Jr., first came into care, he was on medication. But he currently does not present any need for medication. *Id.* Ms. Lusczek noted A.C.H. displayed only minor behavior issues, and all of his needs are being adequately addressed by his foster parents. *Id.* at 37. Ms. Lusczek testified that C.J.H. had a difficult time adjusting to kindergarten, and he displayed behaviors that were difficult to manage. *Id.* at 38. She noted, however, that C.J.H. received counseling in school and has "done well" throughout the school year. *Id.* She testified that his foster parents have adequately addressed all of his issues as well. *Id.*

Accordingly, we discern no abuse of discretion or error of law by the orphans' court in terminating Mother's parental rights pursuant to Section 2511(a)(1) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/7/2023